UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
UNITED STATES OF AMERICA ex rel. DR.    :
GABRIEL FELDMAN,
                                        :
              Plaintiff-Relator,        :
                                        :
         -v-                            :
                                        :
THE CITY OF NEW YORK,                   :
                                        :          09 Civ. 8381 (JSR)
              Defendant.                :
------------------------------------ x             OPINION
UNITED STATES OF AMERICA,               :
                                        :
              Plaintiff-Intervenor,     :
                                        :
         -v-                            :          ┌─────────────────────────┐
                                        :          │ USDC SDNY               │
THE CITY OF NEW YORK,                   :          │ DOCUMENT                │
                                        :          │ ELECTRONICALLY FILED    │
              Defendant.                :          │ DOC #: _____          │
------------------------------------ x             │ DATE FILED: 9/2/11      │
                                                   └─────────────────────────┘

JED S. RAKOFF, U.S.D.J.


        Relator Dr. Gabriel Feldman filed this qui tam action, alleging

that the City of New York (the "City") violated Section 3279(a)(1)

of the False Claims Act (the "FCA"), 31 U.S.C. § 3729 et seq., by

presenting false claims for payment, and making false statements

material to false claims, in connection with the City's

administration of certain Medicaid program benefits.  Subsequently,

the United States (the "Government") intervened, and both the

Relator and the Government filed amended complaints, which the City

moved to dismiss in their entirety.  After careful consideration of

the parties' written submissions, as well as their oral arguments,
the Court, by Order dated April 13, 2011, (a) dismissed the
Relator's Amended Complaint in its entirety, (b) dismissed the two
New York common law claims in the Government's Amended Complaint,
and (c) denied the City's motion seeking dismissal of the
Government's claims arising under the FCA.   This Opinion explains
the reasons for those rulings.

     The pertinent allegations, taken from the Amended Complaints of
the Relator and the Government, from documents expressly referenced
in those complaints, and from materials in the public record that
are subject to judicial notice, are as follows.   Medicaid is a joint
federal-state program that helps provide medical assistance to low-
income individuals.   See Social Security Act of 1965, 42 U.S.C. §
1396 (stating that Medicaid was established "[f]or the purpose of
enabling each State . . . to furnish . . . medical assistance on
behalf of families . . . whose income and resources are insufficient
to meet the costs of necessary medical services").   The basic
structure of Medicaid is as follows.   Each State establishes its own
"plan" for the provision of Medicaid services to eligible
individuals,[1] and the State directly pays health care providers for
services rendered under their plans.   See 42 U.S.C. § 1396(a).

---

[1] "Within broad Federal rules, each State decides eligible groups,
types and range of services, payment levels for services, and
administrative and operating procedures."   42 C.F.R. § 430.0.

Though State plans are subject to federal approval and review, each State is responsible for the administration of its own plan.  See 42 C.F.R. §§ 430.0 et seq.  The federal government then makes quarterly grants to each such State to reimburse the State for the federal share of Medicaid expenditures.  See 42 C.F.R. §§ 430.30.  This share is determined primarily on the basis of a formula set forth in the Social Security Act, which sets the federal share anywhere from 50% to 83% of total Medicaid expenditures, depending on the per-capita income of the particular State.  See 42 U.S.C. § 1396d; see also First Amended Complaint-in-Intervention of Plaintiff-Intervenor the United States of America ("Gov. Am. Compl.") ¶ 1 (noting that the federal share of Medicaid expenditures made by New York State is roughly 50%).

Federal law also permits States to derive a portion of the non-federal share of Medicaid expenditures from local sources of revenue.  42 U.S.C § 1396a(a)(2); 42 C.F.R. § 433.53.  In New York State, local governments such as the City must fund a part of the non-federal portion of the State's Medicaid expenditures.  See N.Y.L. 2005, ch. 58, Pt. C.  However, since 2005, New York State has capped the amount in Medicaid expenses that a local social services district, such as the City, can be required to pay for a given year, with the excess to be borne by the State.  See id. § 1[b].

3

To obtain reimbursement for the federal share of program expenditures, a State must submit a quarterly expenditure report (the "CMS-64 Report") stating the amount the State expended on services during the relevant quarter. The CMS-64 Reports are submitted to the Centers for Medicare and Medicaid Services (the "CMS"), the branch of the Department of Health and Human Services ("HHS") that administers federal aspects of the Medicaid program. See 42 C.F.R. § 430.30. As a general matter, the United States must reimburse the States for the federal share of any expenditure allowable under the State's plan that is included on a CMS-64 Report, and, accordingly, there is no prescribed limit on the federal government's Medicaid expenditures. See id. However, under federal rules and regulations, States may only seek reimbursement for expenditures that are incurred in accordance with applicable state statutes and regulations. See OMB Circular A-87 codified at 2 C.F.R. § 225, Appx. A(C)(1)(c). Further, after October 2001, each CMS-64 Report that a State submitted to HHS contained the express certification that the "report only includes expenditures . . . that are allowable in accordance with applicable implementing federal, state, and local statutes, regulations, policies." See Gov. Am. Compl. Ex. C.

In New York State, Medicaid is administered by the New York State Department of Health (the "DOH"), which established, and now

4

oversees, an extensive regulatory scheme governing the administration of New York State Medicaid.  See N.Y. Pub. Health Law § 201(1)(v); see also 18 N.Y.C.R.R. § 505.14 ("DOH Reg. § 505.14"). One of the programs so administered is the Personal Care Services ("PCS") program, a Medicaid-funded program designed to provide services to individuals with "disabilities and chronic conditions" who require assistance performing the activities of daily living, such as "eating, bathing, dressing, toileting . . . light housework . . . meal preparation, transportation, grocery shopping . . . and money management."  CMS, The State Medicaid Manual, Pub. No. 45, Ch. 4, § 4480; see also 42 CFR § 440.167; DOH Reg. § 505.14(a)(1) (defining PCS as "assistance with personal hygiene, dressing and feeding; and nutritional and environmental support functions").  In New York State, the PCS Program provides services ranging from a few hours per week, where a beneficiary needs limited assistance with specific functions or tasks, to 24-hour care, where a beneficiary's physical or cognitive limitations are such that he or she requires constant attention and assistance.  See DOH Reg. § 505.14(a).

There are two kinds of 24-hour care available under the PCS Program in New York State.  First, a patient in the PCS program may receive "sleep-in" service, which entails continuous care from a single personal care aide who provides daytime and limited nighttime care and which costs approximately $75,000 per year per patient.

Gov. Am. Compl. ¶ 17.  Second, the PCS program also provides a more intensive level of care, commonly referred to as "continuous 24-hour care" or "split-shift" service, which typically requires two or more aides who provide uninterrupted 24-hour care and which costs approximately $150,000 per year per patient.  See id. ¶ 18; see DOH Reg. § 505.14(a)(3).

New York State delegates Medicaid benefit eligibility determinations to local social services districts, such as the City. See DOH Reg. § 505.14(b).  The City, in turn, charges the New York City Human Resources Administration ("HRA") with administration of the PCS program.  Gov. Am. Compl. ¶ 18 (also noting that HRA carries out its PCS-related responsibilities through its Community Alternative Systems Agency ("CASA") system).  HRA contracts with a variety of for-profit and not-for-profit vendors, which provide direct services to PCS program beneficiaries within the City.  Id. ¶ 20.  Once the City determines that an individual qualifies for services under the PCS Program, it issues authorization notices to that individual and to a designated PCS vendor, describing the types and duration of services that are authorized.  Id. ¶ 22.  In addition, on a weekly basis, the City electronically transmits to DOH a "weekly authorization list" identifying (a) each individual for whom the City authorized personal care services during the previous week, (b) the level, amount and duration of services

6

authorized, and (c) the vendor designated to provide those services. Id. ¶ 23.  Relying exclusively on the City's weekly authorization lists, DOH grants "prior authorization" for PCS vendors to commence, and bill for, PCS program services authorized by the City.  Id. ¶¶ 24, 37 (noting that DOH "prior authorization" is the only means by which PCS vendors can provide, bill, and be paid for PCS program services); see also DOH Reg. § 505.14 (b)(5)("the authorization for personal care services shall be completed prior to the initiation of services.").

New York Medicaid regulations set forth detailed specifications for how the City must authorize and reauthorize personal care services.  See DOH Reg. 505.14 et seq.  In particular, the regulations provide that PCS Program benefits may only be provided if the City (a) finds that the services are "medically necessary," (b) "reasonably expects that the patient's health and safety in the home can be maintained by the provision of such services," and (c) determines that the patient's medical condition is sufficiently "stable" that he or she is "self-directing."  Id. § 505.14(a)(4) (defining "stable" as a patient who, inter alia, "is not expected to exhibit either sudden deterioration or improvement" and "self-directing" as a patient who is "is capable of making choices about his/her activities of daily living, understanding the impact of the

7

choice, and assuming responsibility for the results of the choice.").

Further, under New York State regulations, the City's determination as to whether to authorize 24-hour PCS Program services "must be based on" four considerations: "(i) a physician's order", "(ii) a nursing assessment," "(iii) a social worker assessment" and "(iv) an assessment of . . . the appropriateness and cost-effectiveness of the services."  DOH Reg. § 505.14(b)(3). Finally, in certain situations -- when "there is a disagreement between the physician's order and the social, nursing and other required assessments," when "there is a question about the level and amount of services to be provided," or where "the case involves the provision of [split-shift 24-hour care]" -- New York State regulations require "a local professional director" ("LPD") to conduct "an independent medical review of the case" and make "the final determination of the level and amount of care to be provided." Id. § 505.14(b)(4).  The regulations also permit the LPD's review to be conducted by "a physician designated by the local [LPD]" or "a physician under contract with the local social services department." DOH Reg. §504.14(b)(4)(i).

HRA contracts with the New York County Health Services Review Organization, a not-for-profit organization, to provide local medical directors ("LMDs"), who conduct the review and decision-

8

making functions referenced above.  See Gov. Am. Compl. ¶¶ 11, 19-21.  The Relator, Gabriel Feldman, has served as an LMD since 2006, and also served as an LMD from 1990 to 1993.  First Amended Complaint for Violations of the Federal False Claims Act ("Rel. Am. Compl.") ¶¶ 21-22.

The City's authorization of PCS benefits may not be effective for more than six months absent special circumstances, and in no case for more than twelve months.  DOH Reg. § 505.14(b)(5)(iii). Further, with certain limited exceptions,[2] all requirements for the initial authorization of PCS benefits must be satisfied before the City may reauthorize benefits.  See DOH Reg. §§ 505.14(a)(5)(ix), 505.14(a)(6)(i).  Moreover, the City "must deny or discontinue personal care services" if it finds that they are "no longer medically necessary" or where it "reasonably expects that such services cannot maintain . . . the client's health and safety in his or her home."  Id. § 505.14(b)(5)(v)(c).  However, the City may not discontinue or reduce a current beneficiary's PCS benefits without first (a) finding that there has been a "change in [his or her] condition or circumstances," (b) notifying him or her of its decision in writing, and (c) providing him or her with an

---

[2] The regulations state that "[r]eauthorization of [certain limited "nutritional and environmental support" services] shall not require a nursing assessment if the physician's order indicates that the patient's medical condition is unchanged."  DOH Reg. §§ 505.14(b)(5)(ix), 505.14(a)(6)(i).

opportunity for a "fair hearing" before a State Administrative Law Judge ("ALJ"), with the recipient's benefits continuing until the ALJ has issued its decision. See Mayer v. Wing, 922 F. Supp. 902, 911 (S.D.N.Y. 1996); see also DOH Reg. § 505.14(b)(5)(v). Accordingly, ALJs have the authority to review and reverse PCS benefit determinations made by the City. See M.K.B. v. Eggleston, 445 F. Supp. 2d 400, 405-06 (S.D.N.Y. 2006) (describing New York State's oversight of the City's administration of the Medicaid Program via the ALJ process).

Since 2000, approximately 17,500 individuals have received 24-hour personal care services through the PCS program administered by the City. Gov. Am. Compl. ¶ 2. The Government and the Relator allege that, during this period, the City has systematically authorized and reauthorized "sleep-in" and "split shift" 24-hour care PCS Program services in knowing non-compliance with the State regulatory requirements described above. See id. ¶¶ 41-64 (discussing seven anonymous patients as exemplars of the City's alleged policy and practice); Rel. Am. Compl. ¶ 16. In particular, the Government and the Relator allege that the City, as a matter of standard practice and as a matter of policy, has unlawfully (a) authorized and reauthorized split-shift 24-hour care without first obtaining an LMD determination as to the need for such care, (b) improperly overruled LMD determinations concerning the appropriate

10

level of care for individuals requesting 24-hour care, and (c) reauthorized 24-hour care without first obtaining and reviewing patient assessments prepared by nurses and social workers, as required under New York law.  Gov. Am. Compl. ¶¶ 42-64.

Based on the foregoing allegations, the Government and the Relator each assert two claims under the FCA, 31 U.S.C. § 3729 et seq.: first, a claim for violation of section 3279(a)(1)(A), which prohibits the presentation of false claims for payment, and second, a claim for violation of section 3729(a)(1)(B), which prohibits the making of false statements material to a false claim.  Gov. Am. Compl. ¶¶ 65-75; Rel. Am. Compl. ¶¶ 71-81.  The Government also asserts two claims under New York common law: for payment under mistake of fact and for negligence.  Gov. Am. Compl. ¶¶ 75-81.  The City moves to dismiss both Amended Complaints, in their entirety, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  In addition, the City moves to dismiss the Relator's Amended Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of standing.

The Court first turns to the City's contention that the Relator, Dr. Feldman, no longer has standing to prosecute this qui tam action given that the Government has now intervened to assert the same causes of action as those found in Feldman's Amended Complaint.  As a general matter, a qui tam relator has Article III

11

standing to sue only on behalf of the Government, as an assignee of the Government's claims.  See, e.g., United States ex rel. Kelly v. Boeing Co., 9 F.3d 743, 748 (9th Cir. 1993).  Accordingly, when the Government decides to intervene in a qui tam action, the Government's claims become the operative claims insofar as they are duplicative of those of the relator.  See, e.g., In re Pharm. Indus. Average Wholesale Price Litig., 2007 WL 4287572, at *4 (D. Mass. Dec. 6, 2007).  However, if the Government only partially intervenes in an action, a relator may retain standing to prosecute those aspects of his or her complaint as to which the Government has not intervened.  See, e.g., United States ex rel. O'Keefe v. McDonnell Douglas Corp., 918 F.Supp. 1338, 1346 (E.D. Mo. 1996) (relator's complaint survived as to certain claims not pursued by the Government); Miller v. Hozmann, 2006 WL 3196433 *3 (D.D.C. Oct. 31, 2006) (relator's complaint survived as to certain defendants because the Government did not intervene with respect to those defendants).

Here, the City argues that dismissal of Feldman's Amended Complaint is required because "[it] is entirely duplicative in relevant respects of the Government's Complaint-in-Intervention." Memorandum in Support of the City of New York's Motion to Dismiss the Relator's Complaint ("Def. Rel. Mem.") at 14.  Comparing the two Amended Complaints, the City accurately notes that the Government asserts the same causes of action under the FCA as Feldman (as well

12

as two additional causes of action under New York common law), and that the two Amended Complaints are predicated on nearly identical factual allegations of wrongdoing -- <u>viz.</u> that the City systematically authorized PCS benefits without complying with New York State regulations governing the process by which applications for PCS benefits are required to be assessed.  <u>See</u> Gov. Am. Compl. ¶¶ 65-75; Rel. Am. Compl. ¶¶ 71-81.  In response, Feldman completely fails to specify any material difference between his Amended Complaint and that of the Government's.  <u>See</u> Memorandum of Law of the Relator in Opposition to the City of New York's Motion to Dismiss his Amended Complaint ("Rel. Mem.") at 6-8.

Upon its own, independent review of the two Amended Complaints, the Court can identify no material aspect of the Relator's Amended Complaint not covered by the Government's Amended Complaint.  The Court concludes that Feldman's Amended Complaint is superseded in its entirety by the Government's Amended Complaint and therefore dismisses Feldman's Amended Complaint for want of standing.  The Court notes, however, that this dismissal in no way diminishes Feldman's continuing statutory rights delineated in § 3730 of the FCA, including, most notably, his entitlement to 15-25% of any monetary award recovered by the Government in this action.  <u>See</u> 31 U.S.C. § 3730(d).

13

The Court now turns to assessing the legal sufficiency of the Government's two claims under the False Claims Act.  Section 3729(a)(1) of the FCA renders it unlawful for a "person"[3] to "knowingly present[], or cause[] to be presented . . . a false or fraudulent claim for payment" to the United States.  31 U.S.C. § 3729(a); see also United States ex rel. Kirk v. Schindler Elevator Corp., 601 F.3d 94, 113 (2d Cir. 2010).  The City moves to dismiss this claim on three independent grounds.  First, the City contends that it did not "cause" the submission of a claim to the United States because New York State has ultimate control over the form and content of CMS-64 Reports submitted by DOH to HHS (the "claims for payment" in this action).  Second, the City contends that the CMS-64 Reports are not "false or fraudulent" as those terms are used in the FCA.  Third, the City contends that, even if it can be said to have caused the submission of a false claim for payment to the United States, the Government has failed to plausibly allege that the City did so "knowingly," the requisite scienter under the FCA.

As to the first ground, the Government's Amended Complaint alleges that the City routinely submitted to DOH weekly authorization lists that listed individuals for whom the City had

---

[3] Municipal corporations constitute "persons" under the False Claims Act, see Cook County, Ill. v. United States ex rel. Chandler, 538 U.S. 119 (2003), whereas States do not, see Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765 (2000).

unlawfully and fraudulently authorized and reauthorized PCS

benefits.[4]  See Gov. Am. Compl. ¶¶ 37-40, 46, 53, 61.  The complaint

further alleges that DOH relied on the information contained in the

City's weekly authorization lists to create the quarterly CMS-64

Reports submitted by the State to HHS to obtain the federal share of

the State's PCS expenditures.  See Gov. Am. Compl. ¶¶ 5, 38-40.

The City argues that because the City's initial decisions to

reduce or terminate PCS benefits are subject to review and reversal

by a State ALJ in a "fairness hearing," this breaks the causal link

between the City's actions and DOH's submissions of claims to the

United States.  See Declaration of Bryce L. Friedman, dated February

14, 2011 ("Friedman Decl.") Ex. A (State ALJ decision overturning

the City's initial decision to deny PCS benefits to "Patient D" in

the Government's Amended Complaint); see also Gov. Am. Compl. ¶ 49.

However, State ALJs do not have jurisdiction to review the City's

authorization of PCS benefits.  See DOH Reg. § 505.14(b)(5)(v).

Accordingly, the City identifies no intervening act between its

submission of weekly authorization lists to DOH and DOH's submission

of claims for payment to the United States when the City approves

PCS benefits in the first instance.  Moreover, the fact that a State

---

[4] The Government Amended Complaint also notes that the City: (1)
assesses requests for PCS benefits; (2) makes threshold eligibility
determinations; (3) makes determinations as to the level and amount
of services to be provided; and (4) contracts with vendors to
provide City-approved PCS services.  See Am. Compl. ¶¶ 19-24.

ALJ intervenes in a certain subset of cases to authorize benefits where the City denied such benefits in the first instance does nothing to interrupt causation in those (presumably far more numerous) cases where the City approved PCS benefits on its own accord.  It should also be noted that the Government replies in its Memorandum of Law that it "[does not] seek[] to hold the City liable . . . for cases where an administrative law judge has granted personal care services."  Memorandum of Law of the United States in Opposition to the City of New York's Motion to Dismiss the First Amended Complaint-in-Intervention ("Gov. Mem.") at 17.

The City nonetheless argues that simply because the City does not directly submit the CMS-64 Reports to HHS, proximate causation cannot be shown as a matter of law.  See Memorandum in Support of the City of New York's Motion to Dismiss the United States of America's First Amended Complaint-in-Intervention ("Def. Gov. Mem.") at 15-16.  The argument borders on the frivolous.  It is well-established that the FCA "reaches claims that are rendered false by one party, but submitted to the government by another."  Mason v. Medline Indus., Inc., 731 F. Supp. 2d 730, 738 (N.D. Ill. 2010) (citing cases); see also United States v. Bornstein, 423 U.S. 303, 313 (1976) (finding causation where claims submitted by an innocent contractor were rendered false by the previous actions of a subcontractor); United States ex rel. Schmidt v. Zimmer, 386 F.3d

16

235, 244-45 (3d Cir. 2004) (causation present where defendant's conduct was a "substantial factor" in bringing about the filing of a false claim and the filing was a "normal consequence of the situation created by that scheme"). Here, if the allegations of the Government's Amended Complaint are true, the causal chain is direct and obvious. Accordingly, the Court concludes that the Government has adequately alleged that the City proximately caused the submission of "claims" to the United States seeking payment from the federal treasury.

Turning to the City's contention that the Government has failed to allege the submission of a claim "that is false or fraudulent" in the sense those terms are used in § 3729(a)(1) of the FCA, the Court notes that the Second Circuit, in delineating the contours of what renders a claim "false" under the FCA, has distinguished between claims that are "factually false" and those that are "legally false." See United States ex rel. Mikes v. Straus, 274 F.3d 687, 696-98 (2d Cir. 2001). A "factually false" claim arises where a party supplies "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." Id. at 697. A "legally false" claim, by contrast, arises "where a party certifies compliance with a statute or regulation as a condition to governmental payment." Id. The Second Circuit has further identified two kinds of legally false claims:

17

first, where a claimant makes an "express false certification" of compliance with a particular statutory, regulatory, or contractual term," id. at 698, and second, where a claimant makes an "implied false certification" because "the act of submitting a claim for reimbursement itself implies compliance with governing federal rules," id. at 699.

Here, the Government's Amended Complaint alleges that the City caused DOH to submit legally false claims to the United States, in the form of CMS-64 Reports containing both express and implied false certifications of compliance with applicable federal and state Medicaid regulations.  In response, the City argues, first, that an FCA cause of action premised on a certification theory must allege a false representation of compliance with a "*federal* statute or regulation or a prescribed contractual term." See Mikes, 274 F.3d at 697 (emphasis added).  Here, the City argues, the Government's allegations relate solely to the City's alleged noncompliance with New York State, rather than federal, Medicaid regulations, and accordingly are not "false" under the FCA.  However, while the immediate thrust of the Government's allegations relate to the City's alleged failure to comply with regulatory requirements imposed by New York State law, those requirements, as noted supra, are expressly incorporated into federal regulations.  See 2 C.F.R. § 225, Appx. A(C)(1)(c).  Accordingly, the Court concludes that the

18

Government has adequately pled that the City falsely represented its compliance with a "federal . . . regulation."

Next, the City notes that for the City to be liable for a legally false claim, the certification in question must be made "as a condition to governmental payment." Mikes, 274 F.3d at 697.  The City argues that this requirement is not met here because DOH Reg. § 505.14 does not explicitly precondition payment on compliance with its terms.  That regulation does state, however, that authorization of PCS benefits "must be based on" certain considerations.  See DOH Reg. § 505.14(b)(2).  Moreover, federal regulations provide that Medicaid "costs . . . must . . . [b]e authorized or not prohibited under State  . . . regulations" in order to be reimbursable from the United States.  See 2 C.F.R. § 225, Appx. A(C)(1).  Reading these two requirements in tandem, it is clear that, under federal law, a claimant is entitled to PCS benefit payments only if those benefits are, in fact, "based on" the considerations enumerated in DOH Reg. § 505.14(b)(2).  Accordingly, the Court concludes that Medicaid reimbursement payments made by the United States to New York State are preconditioned on the State complying with the procedural requirements set forth in DOH Reg. § 505.14.

With greater force, the City then argues that the Government has failed to adequately allege an "express false certification" because the Government can identify no "particular" statute to which

19

the CMS-64 Reports certify compliance.  See Mikes, 274 F.3d at 698
(to be liable for making an expressly false certification under the
FCA, a party must certify compliance with a "particular statute,
regulation or contractual term.").  It is true that each CMS-64
Report submitted to HHS after October 2001 states that all reported
expenditures contained therein are "allowable in accordance with
applicable implementing federal, state, and local statutes,
regulations, [and] policies."  Gov. Am. Compl. Ex. C.  But nowhere
do the certifications found in CMS-64 Reports refer to any
particular regulation.  While Mikes may be distinguishable from this
case in some respects (see below), its reasoning is applicable here:
a claim that there has been an express false certification cannot be
premised on anything as broad and vague as a certification that
there has been compliance with all "federal, state and local
statutes, regulations, [and] policies."

But such a certification may still, in context, certify, at a
minimum, compliance with certain core, specific legal requirements
and therefore be sustained under the alternative theory of implied
certification.  As the Government notes, DOH Reg. § 505.14 provides:
(1) that PCS benefits may be authorized "only if" an LMD determines,
inter alia, that particular services are "medically necessary;" (2)
that "authorization for personal care services shall be completed
prior to the initiation of services;" and (3) that PCS benefit

determinations "must be based on" particular documents, including a physician's order, a nursing assessment, and a social assessment. DOH Reg. §§ 505.14(a)(4), (b)(2) & (b)(5). The Government further notes that 2 C.F.R. § 225 -- the federal regulation specifically governing the terms by which the United States will reimburse States under cost-sharing arrangements for benefit programs such as Medicaid -- states that "[t]o be allowable under Federal awards, [a State's] costs must . . . [b]e authorized" in accordance with State law. Id. App'x A(C)(I)(c). Because State regulations require that certain procedures be followed before PCS benefits may be authorized, and federal regulations require that States must follow their own regulatory procedures in order to be eligible for Medicaid reimbursement payments, the Court concludes that the very act of submitting a claim for reimbursement for PCS benefits via the CSM-64 Report constitutes, at a bare minimum, an implied certification that those benefits were authorized in accordance with governing State and federal law.

In response, the City argues that Mikes imposed still a further requirement in the case of implied false certifications, to wit, that "a medical provider" could only be liable under the FCA for making an implied false certification of compliance with an applicable law where "the underlying statute or regulation . . . expressly states . . . that payment . . . is precluded" in the event

21

of the defendant's noncompliance therewith, 274 F.3d at 700

(emphasis in original), -- which, the City contends, is not the case

here.  In assessing this contention, the Court notes that in this

respect the underlying circumstances in Mikes could not be more

different from those presented in the instant case.  The relator in

Mikes, Patricia S. Mikes, was a physician who brought suit against

her former employers after they terminated her employment.  Id. at

692.  The United States elected not to intervene.  Id.  Mikes, in

addition to claims relating to her discharge, alleged that the

defendants had submitted false claims to the United States in

violation of the FCA because they had failed to comply with certain

Medicare regulations relating to the proper maintenance of hospital

spirometers, a tool used to detect certain pulmonary diseases.  See

id. at 694-95; see also Conner v. Salina Regional Health Center,

Inc., 543 F.3d 1211, 1215 (10th Cir. 2008) (discharged physician

alleging that the defendant hospital violated the FCA because it

hired under-qualified scrub staff).  In support, Mikes contended

that the defendants' signing of a generic Medicare reimbursement

form constituted an "implied false certification" that they had not

provided negligent patient care -- with guidelines issued by the

American Thoracic Society and incorporated by reference into federal

Medicare regulations supplying the applicable standard of care.  See

Mikes, 274 F.3d at 693, 700-01.  In effect, as the Second Circuit

22

noted, Mikes was attempting to use the FCA as a vehicle for the
"federalization of medical malpractice" based on a medical
provider's filing of a routine Medicare reimbursement form.  See id.
at 698-700.

It was against the background of these unusual circumstances
that the Second Circuit made the statement that a medical provider's
claim under the theory of "implied false certification" was limited
to situations in which "the underlying statute or regulation . . .
*expressly* states . . . that payment . . . is precluded." Id. at
700.  In so doing, however, the Second Circuit restricted its
holding to FCA claims brought against "a medical provider."  See id.
(because "courts are not the best forum to resolve issues regarding
levels of care . . ., we think a medical provider should be found to
have implicitly certified compliance with a particular rule as a
condition of reimbursement in limited circumstances"); cf. Conner at
1216 (a general certification does not constitute an implied
representation of perfect compliance with all relevant Medicare
regulations).[5]

_____

[5] Analogously, federal Courts of Appeals have dealt with this issue
of constraining FCA liability within reasonable bounds by adopting a
"materiality requirement" -- i.e., requiring that the false claim be
"material" to the government's funding decision.  See, e.g., United
States ex rel. Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 415
(3d Cir. 1999), cert. denied, 531 U.S. 880 (2000). United States ex
rel. Berge v. Bd. of Trustees of Univ. of Ala., 104 F.3d 1453, 1459
(4th Cir.), cert. denied, 522 U.S. 916 (1997).  Applying a
materiality requirement in cases where, as here, the defendant is a

It is clear, therefore, that Mikes does not directly control this case so far as the theory of implied false certification is concerned.  Moreover, none of the concerns expressed in Mikes regarding an overbroad theory of implied false certification are present in the instant case.  Indeed, in contrast to the City's repeated contention that the allegations at issue in this case relate to trivial "paperwork" regulatory requirements, see Def. Gov. Mem. at 2, 7-8, the allegations in the Government's Amended Complaint describe the very type of wrongdoing that the FCA was intended to prevent.  See Rainwater v. United States, 356 U.S. 590, 592 (1958) ("It seems quite clear that the objective of Congress [in enacting the FCA] was broadly to protect the funds and property of the Government" from false and fraudulent claims for payment); see also Cook County, Ill. v. United States ex rel. Chandler, 538 U.S. 119, 134-35 (2003) (Congress's interest in "fighting false claims"

_____

municipality would likely entail holding that municipalities cannot be held liable under the FCA for individual service determinations (i.e., wrongfully denying PCS benefits to an individual) but that they can be held liable for systematic regulatory violations that strike at the core of how federal benefit determinations are made, like those alleged by the Government in the instant case.  In Mikes, however, the Second Circuit declined to address whether materiality is required under the FCA, and instead limited FCA liability to "those instances of regulatory noncompliance that are []relevant to the government's disbursement decisions."  274 F.3d at 697 (stating that this limitation is "related to" but distinct from materiality).  Whether adopting the "materiality" requirement fashioned by other Courts of Appeals would provides a more desirable framework for ensuring FCA liability remains within reasonable bounds is, however, a question outside this Court's purview.

is equally applicable to those made by municipalities as to those made by natural persons).  Specifically, the Government's Amended Complaint alleges that the City approved, and caused the State to submit claims for, billions of dollars worth of PCS benefits without even obtaining, let alone reviewing, three of the four documents upon which PCS authorization decisions are required to be made under New York law: an LMD report, a nursing assessment, and a social assessment.[6]  See Am. Compl. ¶¶ 48-54; DOH Reg. 505.14(b)(2).  In stark contrast to Mikes, the Government's allegations here relate not to whether a medical provider provided the appropriate level of care, but to whether the City impliedly represented its compliance with the fundamental procedural requirements governing the approval of PCS benefits under New York State law.

Furthermore, even if the Mikes court's further limitation on FCA claims brought against medical providers were to be extended to govern the instant case, the Government's Amended Complaint would still have adequately pled a false claim that meets this requirement, on the basis of the City's implied certification of compliance with State Medicaid regulations.  The City contends that the Mikes standard would not be met in this case because federal

---

[6] Buttressing the Court's sense of the highly material nature of these documents under New York law is the fact that these three documents are among the most, if not the most, critical aspects of the administrative record reviewed by ALJs in fairness hearings. See Declaration of Bryce L. Friedman, dated February 14, 2011 at Exs A, C & D.

regulations do not "explicit[ly] precondition" payment of federal
Medicaid matching funds on the State's compliance with DOH Reg. §
505.14.  See Reply Memorandum in Further Support of the City of New
York's Motion to Dismiss the United States of America's First
Amended Complaint-in-Intervention ("Def. Gov. Reply") at 7.
However, the underlying regulations to which the CMS-64 impliedly
certify compliance clearly and unequivocally condition the State's
entitlement to PCS benefit reimbursement payments on the State's
following its own regulatory requirements for authorizing those
benefits.  Because State and federal Medicaid regulations leave no
doubt that federal reimbursement payments to New York State are
conditioned on the State complying with DOH Reg. § 505.14, the Court
concludes that, even if this case were otherwise controlled by
Mikes, which it is not, the Government has still adequately pled
that the CMS-64 Reports were "false" under the FCA in that they
contained an "implied false certification" of compliance with
applicable State and federal Medicaid Regulations, viz. DOH Reg.
§505.14 and 2 C.F.R. § 225, Appx. A(C)(1).

        The Court next turns to the City's third main argument for
dismissing the FCA claims, viz. that the Government's Amended
Complaint has failed to plausibly allege that the City submitted its
false claims "knowing of their falsity" -- meaning with "actual
knowledge," "deliberate ignorance," or "in reckless disregard."  See

FCA § 3729(b).  The Government contends that its allegation that the City systematically authorized PCS benefits in violation of the State Medicaid regulations raises a plausible inference that the City acted in "deliberate indifference" or in "reckless disregard" of the fact that those violations would result in the submission of false claims to the United States.  Gov. Mem. at 20.  The City responds by arguing that the Government's asserted inference is not plausible because the City must pay for a portion of the costs associated with PCS benefits.  Def. Gov. Mem. at 20 (stating that "it simply makes no sense . . . that the City knowingly . . . rip[ped] itself off);" see also Shields v. City Trust Bancorp, Inc., 25 F.3d 1124, 1128, 1130 (2d Cir. 1994) (in evaluating whether a plaintiff has adequately pled scienter against a for-profit corporation, "we assume that the defendant is acting in his or her informed economic self-interest").

The City's argument is, however, flawed in several respects. To begin with, in 2005 the State enacted the "Local Share Cap," which places a maximum limit on the amount each local social services district, such as the City, has to pay in Medicaid expenses for a given year, with the excess to be borne by the State.  See L. 2005, ch. 58, Pt. C., § 1[b]; see also City of New York v. Novello, 77 A.D.3d 514 (1st App. Dept. 2010).  Accordingly, at least since 2005, the City has had no fiscal incentive to avoid wrongful

27

approvals of PCS benefits.  Additionally, the potentially

considerable administrative costs associated with conducting proper

due diligence before making PCS benefit decisions should be taken

into account in any serious analysis as to whether the City's

alleged conduct was "manifestly economically irrational."  See

Duncan v. Pencer, 1996 WL 19043, at *10 (S.D.N.Y. Jan. 18, 1996).

More generally, assessing a municipality's "economic self-

interest" requires a broader perspective than simply focusing on

narrow fiscal concerns.  The Government's Amended Complaint alleges

that the City regularly authorized PCS benefits in violation of

State Medicaid regulations, thus allowing certain of its residents

to wrongfully receive personal care services.  While the City is

required by State law to fund a portion of the State's Medicaid

expenditures, including those for PCS benefits, the majority of such

expenditures are covered by the State and the United States.  See,

e.g., New York State Division of the Budget, 2010-2011 Enacted

Budget Financial Plan 66 (Aug. 20, 2010).  It is altogether

plausible to characterize the City's alleged misconduct -- providing

its residents with undeserved access to very valuable federal

benefits, the cost of only a small portion of which the City must

bear -- as economically (and politically) self-interested, broadly

defined.  The Court therefore concludes that a finder of fact could

reasonably infer from the Government's allegations that the City "knowingly" caused the submission of false claims.

On the basis of the foregoing, the Court holds that the Government has plausibly pled that the City violated § 3729(a)(1)(A) of the FCA by "knowingly" causing the presentation of a false claim to the United States

The Court next considers the Government's cause of action arising under § 3729(a)(1)(B) of the FCA, which makes it a violation of federal law to "knowingly make[], use[], or cause[] to be made or used, a false record or statement material to a false or fraudulent claim." FCA § 3729(a)(1)(B); see also id. § 3729(b)(4) (defining "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property"). This provision establishes a "double falsity" requirement: the Government must allege both (i) a false record or statement, and (ii) a false claim.[7] See United States ex rel. Pervez v. Beth Israel Med. Ctr.,

---

[7] Section 3729(a)(1)(B) of the FCA, enacted in 2009, served to "legislatively overrule" the Supreme Court's decision in Allison Engine Co. v. United States ex rel. Sanders, 128 S. Ct. 2123, 2128 (2008). See, e.g., U.S. v. Karron, 750 F.Supp.2d 480, 491 n.9 (S.D.N.Y. Mar 23, 2011); see also S.Rep. No. 111-10 (Mar. 23, 2009) ("This section amends the FCA to clarify and correct erroneous interpretations of the law that were decided in Allison Engine"). It is drafted so as to impose FCA liability on one who makes a false statement to a recipient of federal funds, even if that statement is never actually passed onto or relied upon by the Government. See United States ex rel. Davis v. Lockheed Martin Corp., 2010 WL 3239228 (N.D. Tex. Aug. 16, 2010). In this Circuit, § 3729(a)(1)(B) retroactively applies to all legal claims (i.e., causes of action in

736 F. Supp. 2d 804, 811 n.38, 815 n.51 (S.D.N.Y. 2010).  The

Government alleges that the weekly authorization lists submitted by

the City to DOH constitute "false records" in that the lists

impliedly, and falsely, represent that the PCS benefits catalogued

therein were authorized in accordance with applicable State Medicaid

regulations.  In response, the City contends that the weekly

authorization lists are not false records because they do not

contain an affirmative misrepresentation.  But this is just another

variation on the express versus implied determination, and the Court

concludes that necessarily implicit in the City's weekly

authorization lists -- which, according to the Government's Amended

Complaint, the State relies on exclusively to grant "prior

authorization" for PCS vendors to commence and bill for PCS

benefits, see Gov. Am. Compl. ¶¶ 24, 37 -- is an assurance that the

benefits were lawfully authorized.  Cf. Mikes, 274 F.3d at 696

("false" in the FCA includes "tending to mislead," and specifically

refers to deception aimed at "extracting money the government

otherwise would not have paid").  Given the Government's allegation

that, in forming the weekly authorization lists, the City

systematically flouted State-mandated procedures for authorizing PCS

benefits, the Government has adequately alleged that the City

---

a complaint) filed by a relator after June 7, 2008, regardless of
when the alleged "false claims" (i.e., requests for payment from the
United States) were made.  See United States ex rel. Kirk v.
Schindler Elevator Corp., 601 F.3d 94, 113-14 (2d Cir. 2010).

created a false record under FCA § 3729(a)(1)(B).  Further, the
City's weekly authorization lists are clearly "material" to the
formation of a false claim, given that they form the primary basis
by which the State compiles the City's PCS benefit information for
inclusion in DOH's quarterly CMS-64 Reports to HHS.  See Gov. Am.
Compl. ¶ 5.

Accordingly, the Court concludes that the Government has
adequately stated a claim under § 3729(a)(1)(B) of the FCA.

The Court turns next to the Government's claims arising under
New York common law, for negligence and for payment under mistake of
fact.  The City first contends that it cannot be held liable on the
Government's negligence claim because the authorization of PCS
benefits is a "discretionary municipal act" for which it enjoys
absolute immunity under New York law.  As set forth in McLean v.
City of New York, 905 N.E.2d 1167, 1173 (N.Y. 2009), municipalities
are absolutely immune from claims arising out of "discretionary
acts," but may be held liable for their "ministerial acts" if the
municipality had a "special duty" to the injured party.  For
purposes of municipal tort liability, a discretionary act is one
"involv[ing] the exercise of reasoned judgment" whereas a
"ministerial act" entails "direct adherence to a governing rule or
standard with a compulsory result."  Lauer v. City of New York, 733
N.E.2d 184, 186 (N.Y. 2000); see also id. at 185-86 (citing the

31

"wrongful discharge of [a] civil service employee" as an example of a discretionary act and the "issuance of a marriage license" as an example of a ministerial act). See also Coulthurst v. United States, 214 F.3d 106, 109 (2d Cir. 2000); Signature Health Ctr., LLC v. New York, 28 Misc. 3d 543, 547 (N.Y. Ct. Cl. 2010).

Here, DOH Reg. § 505.14 sets the basic standard by which the City, through an LMD, must determine whether a particular individual merits PCS benefits. In determining an applicant's eligibility for PCS benefits, the LMD must find that the services are "medically necessary," that the services can "maintain . . . the patient's health and safety in [his or her] home," and that the patient's medical condition is sufficiently "stable." See DOH Reg. § 505.14(a)(4). As applying such standards necessarily entails the exercise of reasoned judgment, the authorization of PCS benefits is clearly, as a general matter, a "discretionary municipal act."

The Government argues, however, that since DOH Reg. § 505.14 also sets forth several specific documents upon which this discretionary determination must be based, the City's alleged failure to collect and consider these documents involved ministerial acts not within the scope of its absolute immunity. But as the New York Court of Appeals held in Lauer, ministerial acts must involve not only obligatory procedures, but obligatory *outcomes* as well. See 733 N.E.2d at 186 (defining ministerial acts as those with,

32

inter alia, "a compulsory result").  Because ultimate PCS benefit
determinations do not turn on the mechanical application of State
regulations, but rather a highly-discretionary assessment of various
considerations, such as whether personal care services are
"medically necessary," the Court concludes that the Government's
negligence claim relates sufficiently to the City's discretionary
acts as to fall within the purview of absolute immunity, and
accordingly must be dismissed.

Finally, the Court considers the Government's other common law
claim, for payment under mistake of fact.  Under New York common
law, the voluntary payment doctrine precludes a party from
recovering voluntary payments "made with full knowledge of the
facts" if the party's ignorance of its contractual rights and
obligations resulted from a "lack of diligence."  See Spagnola v.
Chubb Corp., 574 F.3d 64, 72 (2d Cir. 2009); see also Dillon v. U-A
Columbia Cablevision of Westchester, Inc., 740 N.Y.S.2d 396, 397 (2d
Dept. 2002); see also Island Federal Credit Union v. Smith, 875
N.Y.S.2d 198, 200 (2d Dept. 2009) ("The principle that a party who
pays money, under a mistake of fact, to one who is not entitled to
it should, in equity and good conscience, be permitted to recover it
back is long standing and well recognized.").

Generally, however, "[p]ayment by mistake . . . only lies
against a defendant to whom a benefit (money) was actually paid."

33

United States ex rel. Purcell v. MWI Corp., 520 F. Supp.2d 158, 173

(D.D.C. 2007); United States v. Albinson, 2010 WL 3258266, at *19

(D.N.J. Aug. 16, 2010) (same).  At the very least, to state a claim

for payment under mistake of fact, the defendant against whom it is

asserted must have received some direct and measurable financial

benefit from the payments in question.  See United States v. Rogan,

459 F. Supp. 2d 692, 728 (N.D. Ill. 2006), aff'd, 517 F.3d 449 (7th

Cir. 2008) (United States able to recover against Chief Executive

Officer of a hospital, where the executive's false claims resulted

in the United States making improper payments to the hospital, and

the executive personally received millions of dollars in connection

with his false claims).

     Here, the best the Government can muster is the contention that

the City eventually derived financial benefit from the Government's

PCS benefit reimbursement payments because "Medicaid funds bring

[benefits] to the local economy."  However, the Government cannot

point to a single case (New York or otherwise) involving a claim for

payment under mistake of fact in which a municipality was held

liable for payments it improperly secured for its individual

residents.  Responding to an identical argument to that asserted by

the Government here, the Court in United States v. Incorporated

Village of Island Park, 888 F. Supp. 419, 451-53 (E.D.N.Y. 1995),

stated that:

34

> The leap that is required to allow a cause of action for
> erroneous payment of funds to lie against the [municipal]
> Defendants based on their receipt of these indirect and
> unquantifiable benefits [coming in the form of subsidies to its
> residents] is one that this court is not willing to make.

888 F. Supp. at 452.  The Court concurs that the indirect municipal

benefits associated with stimulating the local economy are far too

attenuated for the City to plausibly be considered the "recipient"

of those payments, as required to adequately state a claim for

payment under mistake of fact under New York common law.

Accordingly, the Court concludes that this claim must be dismissed.

    For the foregoing reasons, the Court hereby reaffirms its Order

dated April 13, 2011 (a) dismissing Dr. Feldman's Amended Complaint

in its entirety, (b) granting the City's motion as to the

Government's Amended Complaint in part, by dismissing the

Government's common law claims for negligence and payment under

mistake of fact, and (c) otherwise denying the City's motion to

dismiss the Government's Amended Complaint.

    SO ORDERED.


Dated:  New York, New York
        September 1, 2011                    JED S. RAKOFF, U.S.D.J.

35